UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARVIN WATFORD,

    Plaintiff,

 v.              Case No. 09-C-244

JULIE MILLER, PATRICIA TROCHINSKI,
KRISTINE TIMM and ROBERT KRIZ,

    Defendants.

**DECISION AND ORDER**

  Plaintiff Marvin Watford, a former inmate of the Wisconsin prison system, brought this civil rights action under 42 U.S.C. § 1983 against defendants Julie Miller, Patricia Trochinski, Kristine Timm and Robert Kriz, all of whom are employees of the Wisconsin Department of Corrections ("DOC"). Watford claims that each of the defendants violated his rights under the Eighth and Fourteenth Amendments by their deliberate indifference to his complaints that his mandatory release date ("MR") had been improperly calculated. By the time the error was discovered, Watford had spent 204 extra days in prison. Because he was released on short notice, Watford was unable to arrange a transfer of his supervision to his home in Maryland and was forced to incur the expense of living in a hotel in Wisconsin for approximately 30 days after his release. Watford seeks compensatory damages for the additional time he was forced to serve in prison, as well as the expenses he incurred before he could return home.

Federal jurisdiction exists under 28 U.S.C. § 1331, and the matter is now before me on defendants' motion for summary judgment. The motion will be denied for the reasons stated below. First, however, I will set forth the facts in the light most favorable to the non-moving party.

**BACKGROUND**

Between May 10, 2001, and July 15, 2003, Watford was sentenced on seven misdemeanor counts in five separate cases occurring in two different counties. On June 11, 2002, consecutive prison terms of thirty months and two years were imposed and stayed on two separate counts, and Watford was placed on probation for a term of three years.[1] His probation was revoked shortly thereafter, and he was received at Dodge Correctional Institution on November 15, 2002, on the previously imposed but stayed sentences. Some of the sentences imposed thereafter were ordered to be served consecutive to earlier ones, but others were not. Following notice of the sentence on his last conviction in July 2003, Offender Records Supervisor Mary Marx and Offender Records Assistant Betty Eslinger at Stanley Correctional Institution where Watford was then serving his sentences, attempted to calculate its effect on his mandatory release, parole eligibility, and maximum discharge dates. The last sentence was ordered to run consecutive to some but not all of the previous sentences. In performing their calculation, Marx and Eslinger erroneously assumed

---

[1]Under Wisconsin law, only felonies are generally punishable by imprisonment in the state prison. Wis. Stat. § 939.60. In order for Watford to have been sentenced to prison on a misdemeanor count, he must have been a repeater within the meaning of Section 939.62 of the Wisconsin Statutes. A defendant is a repeater under Wisconsin law "if the [defendant] was convicted of a felony during the 5-year period immediately preceding the commission of the crime for which the actor presently is being sentenced, or if the actor was convicted of a misdemeanor on 3 separate occasions during that same period, which convictions remain of record and unreversed. Wis. Stat. § 939.62(2).

2

it was consecutive to all of the previous sentences. As a result, they calculated Watford's mandatory release date as December 14, 2007, instead of December 14, 2006.

Watford remained at Stanley Correctional Institution until January 6, 2004. He claims that he informed defendant Julie Miller, who was an Offender Records Assistant ("ORA") 2 at Stanley, that his MR had been improperly calculated during a review of his file as early as October 2, 2003. Watford had requested the review because he thought he was eligible for an initial appearance before the Parole Board. While reviewing his file with Miller, she told him that his new MR was December 14, 2007. Watford states that he knew this was wrong and told Miller that his MR was incorrect. According to Watford, Miller insisted the date was correct without even looking at his file. She became indignant when Watford continued to insist that the date was wrong. Watford became upset and began to swear, at which point Miller threatened to send him "to the hole" for disrespect if he continued. Watford then dropped the subject so as to avoid punishment. He later tried to call his lawyer, but his lawyer's office would not accept Watford's collect calls.

On January 6, 2004, Watford was transferred to Redgranite Correctional Institution. Shortly after his arrival, he requested a file review in a further effort to have his MR corrected. On January 29, 2004, he met with defendant Patricia Trochinski, also an ORA 2, at the Records Office. While reviewing his file in the same room as Trochinski, Watford complained to her that his MR and parole eligibility dates were incorrectly calculated. Trochinski told him to talk to his social worker if he had concerns over when he would be eligible for parole or his MR. On November 16, 2004, Watford again reviewed his file in the presence of Trochinski and complained that his MR was incorrect. Trochinski repeated her previous statement that he could talk to his social worker about it. She also told him he could write the judge. By this time, Watford claims he was extremely

3

frustrated because no one would listen to him, so he began to argue with Trochinski, accusing her of not listening to him. Trochinski responded that she did not have to listen to his complaints and threatened to call a guard if he kept it up. Fearing that he might be written up for disrespect, Watford again dropped the subject.

Watford also spoke to defendant Robert Kriz, his social worker at Redgranite, as Trochinski had suggested. When he first spoke to Kriz about the error, Kriz told Watford to talk to his unit manager, defendant Kristine Timm. When Watford talked to Timm about the problem she initially said she would check on it. When he again asked her about it several days later, Timm looked annoyed and told him he would have to talk to his Kriz, his social worker. When Watford returned to Kriz, he seemed exasperated and told Watford to write to the judge who sentenced him. Watford never followed this advice because the problem was with the prison authorities who calculated his MR, not the judge who sentenced him. He continued to bring the matter up whenever he saw Kriz to the point where Kriz would start their conversations with the statement "we're not going to go over that again – you know what you have to do." (Pl.'s PFOF ¶ 128.)

In April of 2004, Watford's mother, Dorothy Jackson, and her fiancé came from their home in Maryland to visit Watford at Redgranite. Mrs. Jackson also spoke with Kriz about Watford's concern that his MR had been improperly calculated. Kriz informed Mrs. Jackson that the calculation was not wrong and that her son's release date would be near the end of 2007. When Mrs. Jackson told Kriz that her son's attorney had told them at the time of his last conviction that he would be out in 2006, Kriz responded that the people at the prison who make these calculations do them all the time and do not make mistakes. He told her whatever the paperwork says is correct.

Watford was transferred to the Wisconsin Secure Program Facility on March 23, 2005. He appears to have made no further attempts to have his MR corrected. Finally, on June 20, 2007,

4

Watford was transferred to Racine Correctional Institution, where the staff at the Records Office discovered the error in Watford's sentence calculation. The staff corrected his MR to read December 14, 2006, and Watford was released from prison on July 5, 2007, 204 days past his MR.

In their motion seeking summary judgment, the defendants deny that they were deliberately indifferent to Watford's situation. Each of the defendants denies any recollection of Watford voicing his concern regarding his MR, and Kriz says he does not remember receiving a call from Watford's mother. They also contend that they had no obligation to assist Watford in his efforts to correct his MR because it was not their job to do so and the institutions where they were stationed had established procedures, or "chains of command," for inmates to addressing errors in sentence computation. Under these circumstances, they contend, Watford is unable to show deliberate indifference because even if they knew of his complaint and took no action in response, such inaction would have been reasonable and not evidence of deliberate indifference. The existence of chains of command for addressing sentence computation questions, the defendants argue, also means that the cause of Watford's continued confinement was his own failure to follow the chain of command, and not any conduct on their part. Finally, the defendants contend that even if their failure to act could constitute deliberate indifference, they are immune under the doctrine of qualified immunity. For all of these reasons, the defendants contend they are entitled to summary judgment.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2); *Celotex*

5

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**ANALYSIS**

The Eighth Amendment prohibits the infliction of "cruel and unusual" punishment on those who have been convicted of a crime. U.S. Const. amend. VIII. The phrase "cruel and unusual" punishment has been held to include punishment that is "totally without penological justification." *Gregg v. Georgia*, 428 U.S. 153, 183 (1976); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).

Continued incarceration beyond the term imposed by a judge or established by the state is not penologically justified. *Sample v. Diecks*, 885 F.2d 1099, 1108 (3rd Cir. 1989); *see also Campbell v. Peters*, 256 F.3d 695, 700 (7th Cir.2001)*; Russell v. Lazar*, 300 F. Supp. 2d 716, 720 (E.D. Wis. 2004). Thus, such incarceration has been held to violate the Eighth Amendment. *Campbell*, 256 F.3d at 700. To establish liability under § 1983 on such a claim, a plaintiff must prove three elements:

> First, a plaintiff must demonstrate that a prison official had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted. Second, the plaintiff must show that the official either failed to act or took only ineffectual action under the circumstances, indicating that his response to the problem was a product of deliberate indifference to the prisoner's plight. Finally, the plaintiff must show a casual connection between the official's response to the problem and the unjustified detention.

*Moore v. Tartler*, 986 F.2d 682, 686 (3d Cir. 1993) (citing *Sample*, 885 F.2d at 1110).

Courts have emphasized that in order to recover under § 1983 on such a claim, the prison official's failure to act must be the product of at least deliberate indifference, if not actual knowledge, of the likely consequences of non-action. *Campbell*, 256 F.3d at 700 (noting that "courts that have recognized this problem have been careful to note that the extended incarceration must also be the product of deliberate indifference before a constitutional violation, as opposed to an error of state law, is implicated"). Moreover, in determining whether a prison official's failure to act is the product of deliberate indifference, "the official's duties and the role he or she has played in the everyday life of the prison" must be considered:

> Obviously, not every official who is aware of a problem exhibits indifference by failing to resolve it. A warden, for example, although he may have ultimate responsibility for seeing that prisoners are released when their sentences are served, does not exhibit deliberate indifference by failing to address a sentence calculation problem brought to his attention when there are procedures in place calling for

7

> others to pursue the matter. On the other hand, if a prison official knows that, given his or her job description or the role he or she has assumed in the administration of the prison, a sentence calculation problem will not likely be resolved unless he or she addresses it or refers it to others, it is far more likely that the requisite attitude will be present.

*Sample*, 885 F.2d at 1110. The same point was made more recently by Chief Judge Easterbrook in the context of a prisoner complaint for failing to provide proper medical care:

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen. Burks's view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right. The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care.

*Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). It is with these principles in mind that I turn to the defendants' argument that they are entitled to summary judgment on Watford's claim.

The defendants first argue that they are entitled to summary judgment because they had no knowledge of Watford's sentence computation problem and because he failed to follow the proper procedure for addressing such a problem. They assert that they have no recollection of Watford or his mother ever mentioning to them at any time during his incarceration at Stanley or Redgranite that he had a concern about his sentence computation. And because sentence computation was not part of their job, defendants Miller, Kriz and Timm contend that they were not the proper persons to contact in any event. If Watford had mentioned his concern to them, three of the defendants state

8

they would have referred him to the chain of command, or established procedure, for addressing such a concern that existed at their respective institutions. Defendant Trochinski admits the performing sentence calculations was within her job duties, and thus if Watford had mentioned his problem to her, she would have reviewed the sentence structure herself and brought the matter to the attention of the Offender Records Supervisor, whose office was adjacent to hers.

The issue of whether the defendants knew of Watford's problem is clearly a question of fact that cannot be resolved on summary judgment. Watford is not required to demonstrate that the defendants actually knew that his MR date had been improperly calculated, only that he claimed it was. As noted above, a plaintiff attempting to establish liability for incarceration without penological justification must first show that "the official had knowledge of the prisoner's problem and *thus of the risk that unwarranted punishment was being, or would be, inflicted*. *Moore*, 986 F.2d at 686 (italics added). Watford maintains that he strenuously complained to each of the defendants at least once and, in the case of Kriz, that his mother notified him, as well. This evidence is more than sufficient to support a finding that the defendants had the requisite knowledge. Moreover, the defendants do not deny that Watford told them of his concern; they simply deny any recollection of it. Under these circumstances, it would be improper to grant summary judgment on the ground that the defendants did not know of the problem.

Given their claim that they have no recollection of Watford informing them that his MR date was incorrectly calculated, it of course follows that none of the defendants claims to have acted in response to his complaint. Despite their failure to act, however, the defendants contend that they are nevertheless entitled to summary judgment because it was not their job to correct his MR calculation and the institutions where they were stationed had chains of command, or established

procedures, for addressing such problems.[2] At Stanley, for example, the chain of command was that inmates with sentencing information questions were to contact the Social Worker first, then the Offender Records Supervisor, then the Program Director, and, finally, the Warden's Office. Under the Redgranite procedure, inmates with sentence questions were to contact the Offender Records Supervisor first, then the F Unit Manager, and, finally, the Warden's Office. The defendants also contend that inmates at Stanley and Redgranite were made aware of these procedures. At Stanley, this information was posted on unit bulletin boards, and all inmates were expected to familiarize themselves with such posted information. And at Redgranite, the information was included in the Inmate Handbook that was given to all inmates upon their arrival.

Because all inmates were expected to follow the proper chain of command when issues arose, the defendants argue that their failure to act (assuming they were told of the problem) could not constitute deliberate indifference. This follows, they argue, "because a prison official 'does not exhibit deliberate indifference by failing to address a sentence calculation problem brought to his attention when there are procedures in place calling for others to pursue the matter.'" (Def.'s Br. In Supp. of S.J. at 5 (quoting *Sample*, 885 F.2d at 1110).) Conversely, they argue that the existence of these procedures means they "could not have known that the plaintiff's sentence calculation problem would 'not likely be resolved unless [they] addresse[d] it or refer[red] it to others.'" (*Id.*) (brackets original). In addition, and for the same reason, the defendants argue that their failure to act cannot be found to have been a cause of Watford's extended incarceration. Instead, they argue,

---

[2]Watford objects to my consideration of the documents setting forth these procedures on grounds of lack of foundation and failure to authenticate. I am satisfied from the content of the affidavits to which they are attached that the knowledge of the witnesses and the authenticity of the documents are sufficiently established for them to be admissible.

10

the cause was his own failure to follow the chain of command. (*Id.*) Finally, citing *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005), the defendants argue that an inmate should not be able to "engineer an Eighth Amendment violation" by failing to follow the proper chain of command. (*Id.* at 6.)

The existence of a "chain of command" at an institution, like "the scope of the official's duties and the role he or she has played in the everyday life of the prison," *Sample*, 885 F.2d at 1110, is a relevant factor to be taken into consideration in determining whether a prison officer's failure to act reflected deliberate indifference. The mere fact that there exists a procedure for resolving a problem, however, does not insulate a prison official from liability for failure to take any action whatsoever. Watford states that he was unaware of the proper procedure. He states he never saw the information posted on the bulletin board at Stanley (Watford Aff. ¶ 13), and, regardless of whether he had been given a handbook when he arrived at Redgranite, he apparently did not know of the procedure there either. Why else would he continue to ask the defendants for help? The suggestion that an inmate would deliberately ignore the proper procedure for correcting his MR so that he could remain in prison longer and thereby "engineer Eighth Amendment violation" is too far- fetched to support an argument for summary judgment. Moreover, the fact that Watford persisted in asking them for help should have made it apparent to the defendants that he did not know of the proper procedure. If that was the case, the defendants should have at least referred him to the proper person who could help him (as they concede they would have done had he asked). Watford claims, however, that none of the defendants even suggested that he follow the procedure they now claim was a well-established chain of command. If these facts are true, a jury could reasonably find that their failure to act was due to deliberate indifference.

11

The result might be different if, as in the example described by the Third Circuit in *Sample*, or Chief Judge Easterbrook in *Burks*, the defendants held positions that were further removed. None of the defendants, however, is a governor, a warden, or even a deputy warden. Two of the defendants, Miller and Trochinsky, are ORA 2s who work under the supervision of persons directly in the chain of command established to address the very issue Watford was trying to get resolved. Trochinsky admitted that sentence computations are within her job duties, and despite Miller's claim that she had no training or experience in sentence computation, her job description lists as one of her tasks the obligation to "provide information on sentences, release dates, computations, . . . to inmates, attorneys, Parole Board members, institution staff, etc." (Aff. of Jeff Scott Olson, Ex. B, Miller dep, ex. 11.) Kriz is a social worker who frequently interacts with inmates, providing counseling, responding to their concerns and questions, and assisting in parole planning. Even Timm, as Unit Manager of Watford's Unit, was not so far removed from such matters that it would be unreasonable to expect her to at least refer Watford to the proper person. She appears to have had regular contact with inmates. The evidence suggests that the F Unit Manager is the fourth level of inquiry for parole eligibility questions, and it is unclear whether other Unit Managers have similar responsibilities. (Pl.'s PFOF ¶ 179.)

In *Sample* the Court observed that "if a prison official knows that, given his or her job description or the role he or she has assumed in the administration of the prison, a sentence calculation problem will not likely be resolved unless he or she addresses it or refers it to others, it is far more likely that the requisite attitude [deliberate indifference] will be present." 885 F.2d at 1110. Here, I conclude that a jury could conclude from the evidence that each of the defendants would have known that if they did not address Watford's problem, or at least refer him to the person

12

who could, it would not be resolved. Assuming Watford's version is true, which I must at this stage of the proceedings, he clearly did not know the proper procedure to have his erroneously calculated MR corrected. If, as Watford contends, the defendants simply disregarded his strongly voiced concerns or responded with indignation, impatience, and threats of discipline, a jury could find that they were deliberately indifferent. If the jury further concluded that Watford simply did not know of the proper procedure, and as a result of their response to his inquiry, was too intimidated to continue raising the issue, a jury could also find that the actions of the defendants caused his extended incarceration.

Lastly, the defendants argue that they are entitled to judgment as a matter of law under the doctrine of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, --- U.S. ----, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The defense of qualified immunity requires the court to determine whether the law was clearly established such that a reasonable government official would have known that the actions taken or not taken violated that right. In determining whether a right is clearly established, the Court must look to controlling Supreme Court and Seventh Circuit precedent. *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir.2009). In addition to determining whether the law was "clearly established" at the time, in making the legal decision of whether an official enjoys qualified immunity for his challenged acts, courts must conduct a fact-intensive inquiry into what the official did (or failed to do). *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987). Once qualified immunity has been raised as an affirmative defense, the plaintiff has the burden of demonstrating

13

that the defendant's error was clearly established. *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008) (citations omitted).

The principle that a prison official can violate an inmate's Eighth Amendment rights by deliberate indifference to his claim that his sentence computation is in error which results in his incarceration beyond his MR was clearly established before any of the defendants are alleged to have acted, or failed to act, in this case. *Campbell v. Peters*, 256 F.3d at 700; *Sample v. Diecks*, 885 F.2d at 1110. In *Campbell*, the Seventh Circuit accepted as true at a general level the proposition that "incarcerating a prisoner beyond the termination of his sentence without penological justification violates the Eighth Amendment as cruel and unusual punishment." 256 F.3d at 700. The defendants contend, however, that the fact that this general principle was clearly established is not enough to deprive them of qualified immunity. As the Court noted in *Campbell*, "we do not deal with generalities. Instead, we must determine whether it was clearly established that the defendants, in revoking the good conduct credits and computing a new release date after the recommitment, were violating Campbell's constitutional rights by requiring him to serve more time than state law and his sentence required." *Id.* at 700-01. Despite its recognition of the general principle of law at issue, the Court in *Campbell* concluded that the prison officials in that case were immune from liability because the state law governing the question of how the plaintiff's sentence was computed was unclear.

The defendants in this case argue that the same applies here. They contend that the fact that Stanley and Redgranite had distinct procedures for addressing sentence computation questions makes the general principle recognized in *Campbell* inapplicable or at least non-determinative. The question raised in this case, the defendants argue, is whether a prison official violates the Eighth

14

Amendment by failing to act in response to sentence computation problem when the institution has a specific procedure to address such concerns, and under that procedure, they were not the person with the responsibility, at least as an initial matter, to address it. As to this issue, the defendants contend, Watford has failed to make the required showing that the law was clearly established. To the contrary, they argue on the basis of *Sample* and *Rodriguez* that, where such procedures exist, an inmate's failure to follow them deprives him of any claim he may otherwise have.

Neither case supports such a conclusion. *Sample*, as noted above, simply indicated that the existence of such a procedure is among the factors a factfinder should consider in determining whether the prison official acted with deliberate indifference. It did not hold that the presence of such a procedure entitles prison officials who are not in the direct chain of command to ignore inmate sentence computation problems. To the contrary, *Sample* recognized that an official may be found to have acted with deliberate indifference under such circumstances if he or she failed to refer the problems to others. 885 F.2d at 1110.

*Rodriguez* has even less relevance. In *Rodriguez* the Court held that "deliberate noncompliance with a valid rule does not convert the consequences that flow automatically from that noncompliance into punishment." 403 F.3d at 952-53. The rule at issue in that case prohibited an inmate from leaving his cell unless he put his belongings away. The result of noncompliance was that an inmate could not leave his cell to take a shower or even eat a meal. The Court rejected the inmate's claim that the result of his deliberate violation of the rule rendered prison officials liable for inflicting cruel and unusual punishment on him. Here, of course, Watford denies that he deliberately violated the chain of command that the defendants insist he should have followed. He claims he did not know of it, and the defendants failed to refer him to it.

15

The fact that each of the institutions where the defendants were stationed had procedures for addressing sentence computation problems does not require application of any principle of law that was not clearly established before the defendants are alleged to have acted or failed to act in violation of Watford's rights. The essential question remains the same: Were the defendants deliberately indifferent to his problem and thus of the risk that unwarranted punishment was being, or would be, inflicted. *Sample*, 885 F.2d at 1110. Under these circumstances, they are not entitled to summary judgment under the doctrine of qualified immunity.

Accordingly, the defendants' motion for summary judgment is denied. The Clerk is directed to set this matter for a telephone status conference in two weeks to allow the defendants an opportunity to determine whether to appeal.

**SO ORDERED** this <u>  26th  </u> day of March, 2010.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
